IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:21-CR-29-KAC-DCP |
| | ) | |
| DESHAWN WHITED, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate.

Now before the Court is Defendant Whited's Motion to Suppress Identification [Doc. 26], filed on July 23, 2021. The Government filed a Response to Defendant's Motion to Suppress [Doc. 27] on August 6, 2021. An evidentiary hearing was held on October 18, 2021. [Doc. 43]. Assistant United States Attorney Alan Kirk appeared on behalf of the Government. Attorney Mark Brown appeared on behalf of Defendant, who was also present. At the conclusion of the hearing, Defendant requested permission to file a post-hearing brief, which was granted. Defendant timely filed his post-hearing brief on October 26, 2021 [Doc. 38], and the Government responded that no new argument or issue was raised by Defendant, so no further substantive response would be submitted. [Doc. 39].

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that Defendant's Motion to Suppress [Doc. 26] be denied.

## I. POSITIONS OF THE PARTIES

Defendant is charged with six counts of Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a); one count of carjacking in violation of 18 U.S.C. § 2119; seven counts of brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A); and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  [Doc. 2].  Defendant moves to suppress any identification of him made by a carjacking victim on January 20, 2021, claiming the police showed the victim a suggestive photographic lineup in violation of Defendant's Fifth Amendment right to Due Process.  [Doc. 26 at 1].  Defendant maintains that the photo lineup was suggestive because the subjects were too dissimilar in appearance.  [*Id.*].

The Government argues that the photo lineup card was not impermissibly suggestive or otherwise conducive to a mistaken identification.  [Doc. 27 at 1].  It maintains that the six persons pictured in the photographic lineup are similar in age, hairstyle, and skin tone.  [*Id.* at 3].

## II. FACTUAL BACKGROUND

During the evidentiary hearing, the Government presented the testimony of Andrew Markham ("Inv. Markham"), an investigator in the Criminal Investigations Division, Violent Crimes Unit of the Knoxville Police Department ("KPD").

Inv. Markham testified that while investigating several armed robberies involving an individual matching Defendant's description and, in working with other officers, they developed Defendant as a suspect.  [Doc. 43 at 13].  He explained that Defendant has several distinguishing features, including "dreadlocks down to his ears, a tattoo under his eye, and had been using a specific firearm during these incidents."  [*Id.*].  On January 20, 2021, a carjacking had been reported, and the description of the suspect given by the victim matched the description of Defendant related by victims of other armed robberies under investigation.  [*Id.*].

2

Inv. Markham spoke with the carjacking victim to arrange for him to give a statement at the police department, and he prepared a photo lineup using a software system called Vision RMS. [*Id.* at 13–14]. He explained, "[I]f we develop a suspect, we can draw that person's information, their driver's license, photo, and basically that system, from that system, it will -- it will generate numerous people based on physical descriptions . . . [a]nd from there, we select matches that would be of similar characteristics to the person that we have as our suspect." [*Id.* at 11]. Vision RMS generates numerous photos of individuals based on selected physical descriptions such as height, weight, age, race, and hairstyle. [*Id.* at 11 & 14]. Once the general descriptors are selected, Vision RMS generates pictures from driver's license photos that have been imported into the system. [*Id.* 14–15 & 18–20].[1]

Inv. Markham stated that he carefully went through the generated photos, located individuals that matched the suspect's characteristics, and selected six pictures, with one being that of Defendant. [*Id.* at 15]. He explained that based on Defendant's photo, he selected photos of people with matching hairstyles and age range, and he stated that he tried "to get close to the complexion as I could."[2] [*Id.* at 18]. Inv. Markham added that he tried "to at least get somebody - - not everybody with their mouth shut; not everybody smiling. Just tried to get as close to picture one as I could." [*Id.*]. Inv. Markham did not choose the order in which the selected photos would be displayed in the lineup. Instead, using a randomized system, the software determined the order in which the photos were displayed. [*Id.* at 18–19 & 26]. The generated photographic lineup

---

[1] Inv. Markham explained that when an officer inputs a report following a traffic stop, report, or ticket with the names of victims or suspects, the drivers' license photos of the named victims and suspects are automatically imported into this reporting system. [Doc. 43 at 14–15 & 22–23].

[2] Inv. Markham testified that the photos included individuals with skin tones varying "a little lighter" and "a little darker." [Doc. 43 at 21].

3

consisted of six photographs of black males [Doc. 27-1].[3]  Defendant's photo was the first photograph in the lineup.

Two hours after the crime occurred, Inv. Markham presented the photographic lineup to the victim at the police department, which was recorded by video.[4]  [Doc. 43 at 15].  Inv. Markham testified that prior to the identification, he told the victim, "People's characteristics change, hairstyles change.  They may have had tattoos.  They may have gotten tattoos . . . [t]he facial characteristics . . . eyes and nose, are the ones that you need to pay attention to because those don't change."  [*Id.* at 25–26].  The video footage taken during the interview of the victim was submitted into evidence.  [Exh. 1].

The video footage is approximately twelve minutes and forty-six seconds long.  It begins with Inv. Markham asking the victim to explain what happened.  The victim stated that he was traveling on Broadway, and the suspect who was standing with a guy at a four-way stop in the downtown area where the homeless mission is located, flagged the victim down.  The suspect walked up to the victim's car, and thinking he wanted money, the victim rolled down his window.  The suspect then pulled a gun on the victim and told him to get out of the car.  The victim described the gun as a silver 9mm with a square barrel and a black handle.  The victim stated that the suspect asked him if his wallet was in the car and that he responded, "Yes."  The victim explained that as he got out of the car, he grabbed his phone from the vent clip, and then he ran.   The suspect left the scene in the victim's car.

---

[3] The color photograph was entered into evidence at the hearing and referenced as Exhibit A to the Government's response to Defendant's Motion to Suppress.  [Doc. 43 at 7].

[4] Inv. Markham testified that the carjacking incident occurred at 2:29 p.m., the victim came to the KPD headquarters shortly after 4:00 p.m., and the photographic lineup was conducted at 4:20 p.m.

4

Next, the victim was asked to describe the car that was stolen, and at approximately the 4:50 mark on the video, Inv. Markham began asking the victim questions about the suspect. The victim stated that the suspect was wearing an "army green" jacket with a gray hood. The suspect was not wearing a mask. The victim only saw the top half of the suspect and was unable to describe the pants or shoes the suspect was wearing. In terms of age, the victim stated that the suspect was probably in his mid-twenties or younger. Inv. Markham asked if he recalled anything special about the suspect's appearance, and the victim responded that there was a tattoo under his right eye. While not able to say what the tattoo looked like, the victim described it as a single, black tattoo that was large in size. When asked about hair and skin tone, the victim stated that the suspect's hair was chin length braids and that he had light-colored skin.

Then, Inv. Markham stated that he thinks they have a suspect in several other cases that "kind of meets that description." He explained to victim that he prepared a lineup, pointing out that while things may be different such as there may not be tattoos and that the hair may be different, facial features should be same—skin tone and other distinguishing features. Inv. Markham asked the victim if he thought he got a good enough look at the suspect's face to pick him out of a line up, and the victim responded, "…(unintelligible)…yeah." Inv. Markham explained that he would be showing the victim a series of six pictures. He stated that the suspect may not be in the lineup, and if not, that is fine. He further stated that if the suspect is in the lineup and if the victim feels confident it is the suspect, then he wants the victim to pick out the suspect.

5

He asked if the victim had ever been shown a lineup to which the victim responded, "No." He showed the victim the lineup and reiterated that tattoos and hair may be gone, and within seconds, the victim stated, "The first one," identifying Defendant's photograph. Inv. Markham asked Defendant how confident he was about the identification, and the victim responded that he was ninety percent confident, noting the only differences were that the suspect's hair was a little longer and he had "a face tatt."[5] Inv. Markham had the victim circle the photo he selected and sign and date the lineup form, ending the identification portion of the video recording at approximately the 8:40 mark on the video. The Court notes that the victim appeared to have interacted and communicated effectively with Inv. Markham throughout the interview, which was supported by the testimony of Inv. Markham at the hearing. [Doc. 43 at 29].

## III.    ANALYSIS

Defendant seeks to suppress the identification made by the victim, who identified Defendant as the suspect based upon a photographic lineup. Defendant argues that the lineup violated his Due Process rights because the photo array was unduly suggestive in that there were too many dissimilarities in the subjects of the lineup shown to the victim.

"Due process forbids police officers from using identification procedures that are 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Watson*, 540 F. App'x 512, 514–15 (6th Cir. 2013) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *see also Howard v. Bouchard*, 405 F.3d 459,

---

[5] At the hearing, Inv. Markham testified that the photograph of Defendant used in the lineup was an older driver's license photo without a tattoo under the right eye. Inv. Markham explained that he did not want the photograph of Defendant to be the only one with a tattoo under his right eye and "taint the lineup that way." [Doc. 43 at 18].

469 (6th Cir. 2005). Defendant bears the burden of demonstrating that the identification procedure was impermissibly suggestive. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).

To determine the admissibility of the identification, the court engages in a two-step analysis. Under this approach, "[s]uppression is warranted only if (1) the identification procedure was unduly suggestive, and (2) the identification was not otherwise reliable under the totality of the circumstances." *Watson*, 540 F. App'x at 515 (citations omitted). As both steps must be met for suppression, it is not necessary to analyze the second step if the first is not met. *See id.*

Under the first step, the Court examines whether the identification procedure was unduly or impermissibly suggestive. *U.S. v. Lusenhop*, No. 1:14-CR-122, 2015 WL 1487126, at *1 (S.D. Ohio Apr. 1, 2015). "This is a fact-specific determination, and the court may consider 'the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves.'" *United States v. McComb*, 249 F. Appx. 429 (6th Cir. 2007) (quoting *United States v.* Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994). The inquiry focuses on whether "the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection." *Cornwell v. Bradshaw,* 559 F.3d 398, 413 (6th Cir. 2009). To illustrate improper suggestion, the Supreme Court has pointed to lineups where "all in the lineup but the suspect were known to the identifying witness, . . . the other participants in [the] lineup were grossly dissimilar in appearance to the suspect, . . . only the suspect was required to wear distinctive clothing which the culprit allegedly wore, . . . the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, . . . the suspect is pointed out before or during a lineup, . . . the participants in the lineup are

7

asked to try on an article of clothing which fits only the suspect." *Perry v. New Hampshire*, 565 U.S. 228, 243 (2012) (quoting *United States v. Wade,* 388 U.S. 218, 232–33 (1967)).

Defendant argues that the photo lineup here contained too many dissimilarities in the subjects—making it unduly suggestive. The undersigned disagrees. Here, the victim reported to law enforcement that he had been able to see the face of the man, whom he later identified as the Defendant, during the alleged carjacking. The victim was able to recall numerous physical characteristics of the perpetrator. The victim was unable to see the lower half of the perpetrator's body; however, he was able to recall seeing him wear an "army green" jacket with a gray hood. The perpetrator was unmasked during the incident, so the victim was able to view his face—this included a black facial tattoo even though the victim was unable to recall specifics about the tattoo beyond its location on the right side of the perpetrator's face, its general size, and its black color. The victim estimated that the perpetrator had been in his mid-twenties or younger. The victim recalled that the perpetrator had braids that were about "chin length." The victim stated that the perpetrator was a "lighter skinned" black male.

Inv. Markham stated at the suppression hearing that he had selected the particular photographs for the lineup based on the characteristics of Defendant appearing in his driver's license photo that was used for the identification proceedings. Inv. Markham tried to match people with hairstyles similar to Defendant's in the photo and of similar age, and he tried to get as close to the same complexion as he could. He also tried to procure photos with all the subjects having closed mouths with neutral expressions. The Court notes that Inv. Markham acknowledged that the older driver's license photo he used for Defendant did not depict Defendant with his facial

8

tattoo. This was a conscious decision made by Inv. Markham, and one that the undersigned finds indicates that this identification proceeding was conducted in an appropriate manner. Inv. Markham stated that he specifically chose a photo of Defendant without the facial tattoo because he did not want to risk the lineup being tainted due to being overly suggestive. Furthermore, the photos that were presented to the victim were from a larger pool of photos from which Inv. Markham tried to assemble as similar and fair a pool of subjects as he could. Finally, Inv. Markham explained that the order in which the photos appear in the array is randomized by the software that is used to generate them.

In his post-hearing brief [Doc. 38], Defendant argues that "[t]here can be no question that the photo array was unduly suggestive." Defendant stresses that the human element involved in making photo arrays like the one here is to blame for the suggestive proceedings. The undersigned does not agree. In fact, Inv. Markham went to notable lengths to ensure that Defendant's photograph would not be immediately selected by the victim by choosing an older photo of Defendant without a facial tattoo. Defendant notes that three of the subjects in the other photos had a darker complexion, only two of them were "lighter-skinned" persons, and two did not have similar hair to Defendant. The undersigned does not necessarily agree with this description of the photo array, but in any case, finds that none of the photographs are "grossly dissimilar" such that any differences in appearance tend to isolate Defendant's photograph. *See Hall v. Parris*, No. 2:15-cv-02273-TLP-tmp, 2019 WL 1431232, *13 (W.D. Tenn. Mar. 29, 2019) (observing that six color photographs of black males of different complexions but similar hair styles and mustaches were not unduly suggestive because no photograph was "grossly dissimilar").

9

Next, Defendant argues that Inv. Markham's statement to the victim that law enforcement officers had been investigating a potential suspect with a similar description to the individual described by the victim was impermissibly persuasive. Defendant also takes issue with Inv. Markham informing the victim that the suspect may or may not actually be included in the photo array, arguing that this too put the victim on notice that the perpetrator would be in the array. The Court finds these arguments to be conjecture and not overly convincing. It is not apparent to the Court that either of the two preceding statements were an attempt by Inv. Markham to sway the victim into picking any particular individual out of the photo array, or any person at all for that matter. Therefore, the undersigned finds that this argument also fails to establish a strong basis for granting Defendant's motion.

Finally, Defendant spends most of his post-hearing brief discussing the part two factors used for deciding whether an identification that was unduly suggestive was still nonetheless reliable under the totality of the circumstances. *See Neil v. Biggers*, 409 U.S. 188, 199–200 (1972) (those factors being "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and length of time between the crime and the confrontation."). The undersigned finds it unnecessary to discuss these factors in detail, because Defendant has not met his burden to show that the identification proceedings at issue here were unduly or impermissibly suggestive.[6]

---

[6] If the Court were to examine the *Biggers* factors, it would find that they resoundingly support the fairness of the photographic lineup in this case. As discussed above, the victim had a good opportunity to view the perpetrator's face, which was unmasked. The victim was focused on the perpetrator, and his description of the perpetrator matched the Defendant in hairstyle, facial tattoo, age, race, and skin tone. The victim told Inv. Markham that he was ninety percent sure of the identification, and less than two hours elapsed between the carjacking and the identification.

10

For the reasons above and based upon a review of the photo lineup, the video evidence, the facts and circumstances surrounding the identification, and the parties' respective arguments, the undersigned recommends that the Court find that the identification procedure here was not unduly suggestive and therefore not violative of Defendant's Due Process rights—meaning an analysis of step two is unnecessary. Thus, the undersigned recommends that the Court deny Defendant's Motion to Suppress Identification.

## IV.    CONCLUSION

Accordingly, the undersigned **RECOMMENDS**[7] that Defendant's Motion to Suppress Identification **[Doc. 26]** be **DENIED**.

Respectfully submitted,

*Debra C. Poplin*

Debra C. Poplin
United States Magistrate Judge

---

Thus, the totality of the circumstances surrounding the identification reveal that the victim's identification of the Defendant was reliable.

    [7] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Judge need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

11