UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DESHAWN WHITED, )<br>)<br>Defendant. ) | No.: 3:21-CR-29-KAC-DCP |

**ORDER ACCEPTING REPORT AND RECOMMENDATION**

This criminal case is before the Court to consider the Report and Recommendation ("Report") issued by United States Magistrate Judge Debra C. Poplin [Doc. 45]. Judge Poplin held a hearing on Defendant's "Motion to Suppress Identification," [Docs. 35; 43], and on December 1, 2021, she issued the Report, recommending that the Court deny Defendant's motion, [Doc. 26], because "Defendant has not met his burden to show that the identification proceedings" "were unduly or impermissibly suggestive," [Doc. 45 at 10]. Defendant objected to this conclusion, asserting that the identification proceedings were unduly suggestive because the photo lineup contained photos of individuals who were "grossly dissimilar" to Defendant [Doc. 46 at 3-4]. Because Defendant has not demonstrated that the identification proceedings were unduly suggestive, the Court **ACCEPTS** the Report [Doc. 45], **OVERRULES** Defendant's objection [Doc. 46], and **DENIES** Defendant's "Motion to Suppress Identification" [Doc. 26].

At around 2:30 PM on January 20, 2021, a victim reported a carjacking in downtown Knoxville [Docs. 43 26:22; 45 at 2]. As the victim stopped his car at a four-way intersection, an individual "flagged [him] down" and "walked up to [his] car" [Doc. 45 at 4]. When the victim "rolled down his window," the individual "pulled a gun on [him] and told him to get out of the

car" [*Id.* (describing the gun as "a silver 9mm with a square barrel and a black handle")]. The individual asked the victim whether his wallet was in the car, and the victim affirmed [*Id.*]. The victim then got out of the car, grabbed his phone from the car, and fled [*Id.*]. The individual "left the scene in the victim's car" [*Id.*].

The victim provided a detailed description of the individual to the Knoxville Police Department ("KPD"). The victim stated that he "saw the top half of the [individual]" [*Id.* at 5]. The individual did not wear a mask [*Id.*]. The victim recalled that the individual had "a tattoo under his right eye," which he described "as a single, black tattoo that was large" [*Id.*]. He further recalled that the individual was a "lighter-skinned black male" with "chin length braids" [*Id.*; Doc. 43 23:5-6]. The victim estimated that the individual was in his "mid-twenties or younger" [Doc. 45 at 5]. The description provided by the victim matched the description of a suspect that the KPD had received from victims of other armed robberies [Docs. 45 at 2; 43 13:2-6]. The victims of those other armed robberies had also reported that the suspect had "several distinguishing features," including "dreadlocks down to his ears" and "a tattoo under his eye" [Doc. 45 at 2]. The other victims also reported that the suspect used "a specific firearm" [Doc. 43 13:10]. The descriptions provided by these other victims led the KPD to designate Defendant as a suspect in those investigations [Doc. 45 at 2]. Because the description provided by the victim in this case matched the description of Defendant, the KPD likewise designated Defendant as a suspect in this case [*Id.*].

Based on the description provided by the victim in this case and the KPD's prior investigations, KPD Investigator Andrew Markham generated a "randomized" "photo lineup using a software system" called Vision RMS [Docs. 43 11:23-25, 15:13, 26:11; 45 at 3]. Investigator Markham input Defendant's name into Vision RMS to obtain his driver's license photos, and the

software then "select[ed] [driver's license photos of] similar people" of a similar race, gender, weight, age, facial features, and hairstyle as Defendant's driver's license photos [Doc. 43 12:3-12, 14:24-25, 21:17-19]. Investigator Markham "scroll[ed] through" pages of the Vision RMS-generated driver's license photos "to find the closest matches" [*Id.* 14:19-21, 18:10-11]. He "tried to get as close to [Defendant's photos] as [he] could" based on "hairstyles, age range[s,]" and "complexion" [*Id.* 18:2-9]. But he also tried to select photos with individuals who had a complexion that was "a little lighter" and "a little darker" [*Id.* 21:1-6]. While he knew Defendant had a tattoo under his right eye, Investigator Markham consciously chose to use an older driver's license photo of Defendant so that Defendant was not "the only one with a tattoo under his right eye and taint the lineup that way" [*Id.* 18:16-19:1]. Investigator Markham then selected six (6) of the available photos Vision RMS generated, including a photo of Defendant where Defendant did not have the face tattoo [Docs. 43 22:10-13; 45 at 3-4]. Vision RMS then randomly determined the order of the photos for the lineup, listing Defendant's photo first [Docs. 43 15:11-16; 26-1 (photo lineup)]. Below is an image of that lineup.



3

Just after 4:00 PM that same day, the victim came to the KPD office to recount the afternoon, describe the individual, and review the photo lineup [*See* Doc. 43 30:12]. The identification proceedings were recorded on video [Doc. 45 at 4; Ex. 1 (video recording)]. In the room with Investigator Markham, the victim first recalled the carjacking and then described the individual who committed the offense [Doc. 45 at 4-5]. Investigator Markham told the victim that the KPD had a suspect in other investigations "that kind of matches [the victim's] description" [*Id.*; Ex. 1 6:31-33]. Investigator Markham told the victim that he had compiled a lineup for the victim to review [Ex. 1 6:34-36]. Investigator Markham noted that the photos "may be different" [*Id.* 6:40-41]. While the individual photos "might not have tattoos" and might have different hair, the photos' "facial features" and "skin tone" should be similar [*Id.* 6:40-48]. When asked whether he "got a good enough look at [the individual's] face to be able to pick him out of a lineup," the victim responded, "yeah" [*Id.* 6:50-53].

Before showing the victim the lineup, Investigator Markham also told the victim that the suspect may or may not be included in the lineup [Doc. 45 at 5]. He specifically told the victim, "if the guy's not in there, that's fine," "if he is, and you feel confident that's him, I want you to pick him out," "but if it's not, don't pick him out" [Ex. 1 6:56-7:04]. Investigator Markham then handed the victim the lineup, reiterated, "tattoos may be gone, hair may be gone, may be there, whatnot" [*Id.* 7:16-21]. After approximately eight (8) seconds, the victim stated, "the first one" [*Id.* 7:23-24]. Investigator Markham asked, "the first one?," and the victim confirmed, "yeah" [*Id.* 7:24-29]. The victim stated that he felt "about 90 [percent]" confident about the identification, noting that the individual's "hair [was] a little longer" and that he had a "face tat" [*Id.* 7:32-35, 7:39-41]. Investigator Markham then directed the victim to circle the first photo and to date and sign the lineup form [*Id.* 7:46-8:39].

4

Under 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59, Defendant objected to the Report, asserting that as a matter of law, "[t]he Magistrate Judge erred in determining the photo lineup was not unduly suggestive" [Doc. 46 at 5]. As such, the Court adopts the undisputed portions of the Report, including the (1) "Positions of the Parties" and (2) "Factual Background," [Doc. 45 at 2-6], and reviews de novo the Report's legal conclusion that the identification proceedings were not unduly suggestive. *See* 28 U.S.C. § 636(b)(1)(C); *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (per curiam); Fed. R. Crim. P. 59(b)(3).

The Due Process Clause "requires suppression of an eyewitness identification tainted by police arrangement" only where "improper police conduct created a 'substantial likelihood of misidentification.'" *Perry v. New Hampshire*, 565 U.S. 228, 237-39 (2012) (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)). "[I]dentification evidence produced under potentially suggestive circumstances will not be suppressed unless there is improper behavior by state officials giving rise to the suggestiveness." *United States v. Watson*, 540 F. App'x 512, 515 (6th Cir. 2013) (citing *Perry*, 565 U.S. at 233). The defendant bears the burden to demonstrate a "substantial likelihood of misidentification" for suppression. *See United States v. Beverly*, 369 F.3d 516, 538 (6th Cir. 2004).

The Court engages in a two-step inquiry to determine whether law enforcement's conduct during identification proceedings creates "a substantial likelihood of misidentification." *See Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001); *Ledbetter v. Edwards*, 35 F.3d 1062, 1071 (6th Cir. 1994). **First**, the defendant must demonstrate that the identification proceedings were unduly suggestive. *Beverly*, 369 F.3d at 538. **Second**, the Court determines whether the identification was not otherwise reliable "under the totality of the circumstances." *Biggers*, 409 U.S. at 199-200 (internal quotation marks omitted). Where a defendant fails to carry his burden

5

at step one, the Court need not proceed to step two. *See Perry*, 565 U.S. at 248; *United States v. Hill*, 967 F.2d 226, 232 (6th Cir. 1992) ("Only if the defendant meets this initial [step one] burden of proof must the court then go on to determine whether the identification was reliable given the totality of the circumstances.").

As to step one, identification proceedings are unduly suggestive when the proceedings "steer[] the witness to one suspect or another, independent of the witness's honest recollection," *Wilson*, 250 F.3d at 397, or "ma[ke] it all but inevitable that [the witness] would identify [a defendant] whether or not he was in fact 'the man,'" *Foster v. California*, 394 U.S. 440, 443 (1969). The Supreme Court has identified several examples of potential unduly suggestive identification proceedings—including, as is relevant here, when "other participants in a lineup were grossly dissimilar in appearance to the suspect." *United States v. Wade*, 388 U.S. 218, 233 (1967). This is a fact-intensive inquiry. *United States v. Stamper*, 91 F. App'x 445, 459-61 (6th Cir. 2004) (listing several factors bearing on the inquiry, including the lineup's size, "manner of its presentation by the officers," and "details of the photographs themselves"). Where photos of individuals included in a photo lineup share characteristics with that of a suspect, the lineup is not "grossly dissimilar." *See Watson*, 540 F. App'x at 516 (affirming district court's determination that photo array was not unduly suggestive where "[t]he filler pictures in th[e] array shared the[] characteristics [of] rounded faces, short hair, and a light facial hair" and "look similar" to defendant); *United States v. Roberts*, No. 3:18-CR-32, 2022 WL 112232, at *4 (S.D. Ohio Jan. 12, 2022) (concluding six-photo array was not unduly suggestive where all photos in the array "had similar lighting and backgrounds" and were of "individuals [who] looked similar").

Here, neither the lineup itself nor its presentation to the victim was unduly suggestive such that the procedures could create "a substantial likelihood of misidentification." *See Wilson*, 250

6

F.3d 397. Defendant argues that the photo lineup was "grossly dissimilar"—and thereby unduly suggestive—because "three (3) [of the other five (5) photos in the lineup] had a darker complexion than" Defendant, and the "other two (2) 'lighter-skinned' persons" "did not have hair similar to" Defendant [Docs. 38 at 3; 46 at 4]. The actual photos in the lineup contravene that conclusion. The photos resemble Defendant and do share several of his key characteristics. *See Watson*, 540 F. App'x at 516; *Stamper*, 91 F. App'x at 460-61. They depict individuals with a complexion similar to Defendant and the description provided by the victim, while differing slightly. The photos also depict individuals with hair similar to Defendant. Any minute distinguishing factors among each individual photo—which would inhere in any lineup—do not outweigh the core similarities across the entire lineup. *See Stamper*, 91 F. App'x at 461 (noting that "it is unlikely that the[se] difference[s] would 'lead the eye of the unguided viewer' to defendant's photograph, given that all of the men pictured" shared key characteristics); *Roberts*, 2022 WL 112232, at *4.

What is more, Investigator Markham's conduct did not "steer[] the witness to one suspect or another." *Wilson*, 250 F.3d at 397. While generating the lineup, Investigator Markham chose a photo of Defendant without a face tattoo because he did not "want [Defendant] to be the only one with a tattoo under his right eye and taint the lineup" [Doc. 43 18:19-21]. This was to Defendant's benefit, especially given that the victim distinctly recalled a face tattoo on the individual who committed the carjacking. Before presenting the photo lineup, Investigator Markham advised the victim that the individual who committed the crime may or may not be included in the photo lineup [Ex. 1 6:56-7:04]. And while presenting the photo lineup, Investigator Markham appropriately warned that the photo may not be an exact match for the individual who the victim had seen earlier that afternoon [Doc. 43 26:1-6]. Investigator Markham's conduct

7

throughout the lineup process demonstrates his efforts to proactively minimize any chance that the victim would inappropriately identify Defendant's photo in the lineup.

The record does not support Defendant's argument that the photos in the lineup are "grossly dissimilar" to Defendant such that the identification proceedings would be unduly suggestive. *See Wade*, 388 U.S. at 233. Because Defendant has not met his burden to prove the identification proceedings were unduly suggestive, the Court need not address the reliability of the identification proceedings. *See Hill*, 967 F.2d at 232.

Accordingly, the Court **OVERRULES** Defendant's "Objection to Report and Recommendation" [Doc. 46], **ACCEPTS** the "Report and Recommendation" [Doc. 45], and **DENIES** Defendant's "Motion to Suppress Identification" [Doc. 26].

IT IS SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge